Cyril OKOLIE, Plaintiff,

v.

**Barry PAIKOFF (individually, and in his official capacity), The City of New York, and The Department of Housing Preservation and Development, Defendants.**

No. 1:98–cv–06737–ENV–CLP.

United States District Court, E.D. New York.

Dec. 11, 2008.

Cyril Okolie, Queens, NY, pro se.

Robert J. Howard, New York City Law Department, c/o Chadbourne & Parke, LLP, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

VITALIANO, District Judge.

Plaintiff Cyril Okolie brings this civil rights action against defendants Barry Paikoff, the City of New York, and the Department of Housing Preservation and Development ("HPD") (collectively, the "City" or "defendants")[1] under 42 U.S.C. §§ 1981, 1982, and 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"), the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (the "FHA"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"). Okolie is a former commercial tenant in what was a mixed-use City-owned building at 109 Wilson Avenue in Brooklyn, New York (the "Wilson Avenue property" or the "building"). Okolie alleges that defendants deprived him of his interest in this building without due process and further alleges that, given he is a Black born in Africa, defendants discriminated against him by refusing to sell the Wilson Avenue property to him because of his race.

Defendants move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment as to all of plaintiff's claims. Okolie opposes defendants' motion and cross-moves for summary judgment. For the reasons set forth below, defendants' motion for summary judgment is granted as to all of plaintiff's claims and Okolie's cross-motion is denied in its entirety.[2]

---

1. HPD is an agency of the City of New York and as such it is not a proper party to this action. *See* N.Y. City Charter, Ch. 17, § 396 ("[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law"). Accordingly, plaintiff's suit against it is dismissed. *See, e.g., Butts v. New York City Dep't of Hous. Pres. & Dev.*, No. 00–CV–6307, 2007 WL 259937, at *1 n. 2 (S.D.N.Y. Jan.29, 2007). However, because the actions of HPD are, of course, attributable to the City of New York, the claims Okolie pleads against HPD are deemed to be pled against the City, as well. *Id.*

2. Defendant Barry Paikoff apparently passed away on November 11, 1999, approximately one year after this action commenced. *See* January 29, 2007 Suggestion of Death, Docket Entry No. 169. Because plaintiff did not move within 90 days after service of the Suggestion of Death to substitute Paikoff's successor or representative as required by Fed. R.Civ.P. 25(a)(1), his claims as to Paikoff are dismissed with prejudice for this additional reason. Fed.R.Civ.P. 25(a)(1); *Unicorn Tales, Inc. v. Banerjee*, 138 F.3d 467, 469 (2d Cir. 1998).

## I. BACKGROUND

### A. Relevant HPD Programs[3]

The "Neighborhood Entrepreneurs Program" ("NEP") is an initiative administered by HPD's Division of Alternative Management Programs ("DAMP") with the goal of facilitating the return of qualifying City-owned multiple-dwelling properties to the private sector while maintaining rents at affordable levels. Under NEP, a City-owned building (or a cluster of buildings) is redeveloped, with significant public investment, by a neighborhood-based property manager and developer, known as a "Neighborhood Entrepreneur". City-owned buildings considered for NEP are those identified by HPD through its planning offices as in need of extensive renovation. Once HPD identifies a suitable building and determines that it is not already enrolled in a separate HPD-run program, the building is net leased to the Neighborhood Partnership Housing Development Fund Company, Inc. ("NPHDFC"), a not-for-profit corporation. NPHDFC holds the lease to the building while the Neighborhood Entrepreneur manages and renovates it pursuant to a management and development agreement with NPHDFC. Both HPD and NPHDFC provide the Neighborhood Entrepreneurs with aid in technical matters, as well as assistance in obtaining financing for the rehabilitation and for subsequent permanent ownership of the building. Once rehabilitation is complete, and if HPD determines that the Neighborhood Entrepreneur has responsibly managed the building, ownership is conveyed to the Neighborhood Entrepreneur, subject to conditions designed to maintain affordability for the building's tenants.

Residential tenants of a building that HPD is considering for placement in NEP first are sent a notice of preliminary selection informing them that their building is being considered and inviting them to attend a meeting to learn about the program. Thirty days after it sends this preliminary notice, HPD delivers residential tenants a notice of final selection, which offers them the option of applying for a NEP opt-out program called the Tenant Interim Lease program ("TIL"). TIL gives tenants the opportunity to lease and manage the building themselves through their tenants association. Public financing is available for TIL buildings that require rehabilitation, and such work, if needed, takes place while the building remains in City ownership. Upon completion of the renovation, if HPD determines the tenants association has successfully managed the building, the City will convey the building to the association.

Tenants of commercial buildings under NEP consideration are not eligible to participate in TIL. Once HPD places a building in NEP, the building's commercial tenants, if any, receive, within two weeks of the notice of final selection, a notice of eligibility for permanent relocation assistance. Prior to the lease of a building to NPHDFC, commercial tenants are given notice that they will be required to vacate.

Separate and apart from NEP, HPD offers other initiatives designed to facilitate the return of certain City-owned properties to the private sector, among them the Tenant Ownership Program ("TOP"). TOP permits a residential or commercial tenant to purchase a City-owned building of one to five family units, if "the building has not been placed in any other HPD disposition program" and rehabilitation of the building, if needed, is "technically and financially feasible." (Defs.' Ex. H at 2; Pl.'s Ex. B at 2.) Unlike TIL, both residen-

3. Unless otherwise noted, the objectives and general operational framework of HPD programs are unchallenged and give rise to no triable material facts.

tial and commercial tenants may qualify to purchase their building under TOP. However, a commercial tenant may purchase only if there is no residential tenant who is interested (and qualified) to make the purchase. Whether they are commercial or residential tenants, TOP applicants must demonstrate a present ability to purchase the building at market price. (Defs.' Ex. H at 1; Pl.'s Ex. B at 1.) Public financing is unavailable to assist TOP applicants in purchasing or rehabilitating their buildings.

With respect to the "feasible" rehabilitation requirement, Wendell Walters, an HPD assistant commissioner and, between April 1998 and August 2004, the Director of NEP, offered the following explanation, which plaintiff accepts as true and treats as an admission:

> the City will not sell to tenants buildings ... which are dilapidated and in need of substantial structural renovation. Tenant owners under TOP do not have access to the extensive public funding required for extensive renovations and thus, would be unable to cure the very conditions which led [the City to take possession through foreclosure in the first place] and could easily do so again. Thus, ownership under TOP remains limited to buildings requiring minimal renovation and with no need for the extensive public money, rent subsidies and technical assistance available under NEP.

(Walters Aff. ¶ 21.)

In contrast to the process for placing a building in NEP, which is initiated by HPD, a building will not be considered for TOP unless a tenant submits the required application. If a commercial tenant submits a TOP application, HPD provides all residential tenants of the subject building with notice of the application and informs them that they may be eligible to participate in the program.

If a tenant submits a TOP application for a building that has not already been placed in another HPD program and, in the City's determination, the condition of the building renders it suitable for TOP, the application will be processed in a multi-step procedure that includes a determination that the applicant is qualified as a purchaser; that is, whether the applicant has been a tenant in the building for at least a year, is current on rent, and can demonstrate his ability to purchase the building with private financing, among other things. An HPD appraisal of the building is also required. Should an application remain viable at this point, the process continues to unfold with the issuance of a writing advising the applicant of the City's disposition sale price, a meeting between the applicant and TOP staff to discuss terms and conditions and the execution of a sales commitment letter, and the processing by HPD of legal and programmatic documents for submission to the City Council and Mayor for approval. If the process completes and the necessary approvals are obtained, HPD then notifies the applicant and a closing date is selected. (See Defs.' Ex. H; Pl.'s Ex. B.)

## B. The Wilson Avenue Property

The City obtained title to the Wilson Avenue property in May 1983 pursuant to an *in rem* tax foreclosure proceeding. It was at the time a mixed-use building with four residential and two commercial units.

On February 20, 1996, Cyril Okolie entered into an 11–month commercial lease, renewable month-to-month, for one of the two ground floor commercial spaces, where he was to and did operate a laundromat. The parties agree that, at least as late as February 1996, the building was in a dilapidated condition and, by June 1997, was in need of structural and other substantial physical repairs. (See Pl.'s Ex. F.)

Okolie asserts that he became interested in purchasing the Wilson Avenue property soon after signing his commercial lease with the City. Okolie claims that, during the spring or early summer of 1997, he spoke on several occasions with defendant Barry Paikoff, then an HPD employee and a supervisor for TOP, and offered to purchase the building for $20,000. Okolie says that, in the course of one of their conversations, Paikoff asked him several questions about his ability to purchase the building, to which Okolie responded that he had access to sufficient capital. Okolie also says that Paikoff advised him that he had a right under TOP to purchase the building, so long as the residential tenants were not interested in buying it. Okolie claims Paikoff told him to put his offer in writing, which he subsequently did on June 2, 1997 (the "June 1997 letter"). (*See* Pl.'s Ex. F.) Okolie apparently never asked for nor, he claims, was offered, a TOP application at this time.[4]

Three months later, because of its dilapidated condition, the City alleges HPD initiated plans to place the building in NEP. On February 25, 1998, following site visits by HPD and NPHDFC, an HPD assistant commissioner approved the building's scheduling for NEP placement. The City claims that it provided the residential tenants of the building with a notice of preliminary selection on June 30, 1998 and, approximately two weeks later, selected Bushwick Ridgewood Properties ("Bushwick") from its list of Neighborhood Entrepreneurs to manage and develop the Wilson Avenue property. According to the City, HPD held a meeting for the building's tenants on July 29, 1998 to explain NEP and the TIL program and to solicit comments. After consideration of these comments and having received no subsequent written comments, HPD placed the building in NEP and provided the residential tenants with a notice of final selection on August 10, 1998. HPD notified tenants of the selection of Bushwick as the new building manager on October 20, 1998, leased the building to Bushwick on November 2, 1998, and formally transferred title to it on September 27, 2000.[5] Okolie asserts that HPD failed to

---

4. Defendants assert that HPD has no record of any communications between Paikoff and Okolie relating to the purchase of the building during this time, including the June 1997 letter, but argue—correctly—that any disagreement as to these facts is immaterial and should not preclude summary judgment in their favor.

5. Okolie contends in his affidavit that HPD never notified him—a commercial tenant—or any of the residential tenants that the building was to be placed in NEP, or that Bushwick had been selected as the building's manager. (Okolie Aff. ¶ 26.) To support his assertion that the building's residential tenants never received notice, Okolie proffers Exhibit K, a writing that purports to contain the signatures of four tenants of the Wilson Avenue property who claim that they were not notified in writing about NEP. (Pl.'s Ex. K.) Assuming a factual dispute on the issue of notification, as will become manifest, such dispute would not be material to Okolie's claims. In

any event, Okolie has failed to create a factual dispute as to the notification of the residential tenants because he proffers only inadmissible hearsay evidence. Rule 56 requires that an affidavit submitted in opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R.Civ.P. 56(e). Okolie's averments concerning the notice given to the residential tenants lack this basis and instead stem from what those tenants allegedly told Okolie and from what they allegedly asserted in an unsworn and unauthenticated writing, Exhibit K. Without sworn statements from these individuals, Okolie fails to adduce evidence sufficient to create a genuine issue of fact for trial. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (hearsay statement as to what plaintiff was told by third-party "did not constitute competent evidence" and could not be considered in oppo-

develop adequate procedures for the administration of NEP and TOP, such that HPD improperly moved ahead with placing the building in NEP even after, he claims, he had offered to purchase it under TOP.

Okolie says that after he submitted the June 1997 letter, he and Paikoff spoke about Okolie's proposal to purchase the building and that Paikoff said he would get back to him. Sometime in January or February 1998, Okolie visited Paikoff at his HPD office to ask him about the status of his offer. According to Okolie, he and Paikoff had never met in person prior to this occasion.[6] Okolie states that when they met, Paikoff, it seemed to him, was surprised to discover that he was Black and began their conversation by asking him, "where is your accent from?" (Okolie Aff. ¶ 21.) Okolie informed Paikoff that his accent was African. Okolie also asserts that Paikoff asked him whether he had access to funds that would enable him to purchase the building under the terms and conditions of TOP, a question that "confirmed [Okolie's] suspicion" that Paikoff was discriminating against him because of his race. (*Id.* at ¶ 22.) Okolie says he reminded Paikoff that he had told him previously that he had access to adequate funding, but "Paikoff seemed unwilling to listen." (*Id.* at ¶ 23.) Okolie asserts that Paikoff ended their meeting

abruptly and said he would get back to him regarding his application.

On September 29, 1998, Okolie again visited Paikoff at his office to inquire about the status of his offer to buy the building. Okolie states that Paikoff did not tell him that the building had already been placed in NEP but, instead, handed him a formal application for TOP and told him to complete it. Okolie claims he was surprised, because Paikoff had told him previously that no formal application was necessary, but nonetheless completed the form. Approximately one week later, on October 6, 1998, Paikoff sent a letter to the residential tenants of the Wilson Avenue property explaining TOP and informing them that they "might be eligible to participate" in the program. (Defs.' Ex. I.)

Okolie states that on October 29, 1998, he learned for the first time that the building had been placed in NEP and that Bushwick was the new building manager. He initiated the instant action the following day.

## C. Alleged Admissions By Defendants' Counsel

On March 22, 2001, during a recess in a deposition in this action, Okolie claims to have learned from defendants' counsel additional facts concerning an alleged policy by HPD for operating NEP, TOP, and the

---

sition to motion for summary judgment; sworn statement from third-party was required).

6. Defendants argue that Okolie's assertion that he and Paikoff had never met prior to January or February 1998 is inconsistent with his representations in another case filed in this district, *Okolie Cyril v. Neighborhood Partnership II Housing Development Fund, Inc.*, 01–CV–2477, *dismissal affirmed*, 124 Fed. Appx. 26 (2d Cir. July 25, 2005). According to the complaint in that case, which was signed by Okolie on July 25, 2001 and attached here by defendants as Exhibit Q, "[o]n

or about February 1996, [Okolie] and a Director of TOP met, and at this time, [Okolie] expressed his interest in purchasing the [Wilson Avenue property.] Mr. Paikoff spoke about the Housing Initiatives Program of HPD and the purchasing of the building." (Defs.' Ex. Q ¶ 17.) Okolie may, as a result, be judicially estopped from asserting his current contrary recollection. Nevertheless, the Court will accept as true the rendition of the facts contained in Okolie's Affidavit in this matter and will assume, therefore, for purposes of the pending motions, that he and Paikoff had not met personally prior to early 1998.

TIL program. According to Okolie, he overheard Robert Howard, then an attorney with the New York City Office of Corporation Counsel who was representing the City in this action, remark that City lawyers had been able to defeat several claims by tenants alleging that HPD had wrongfully placed buildings in NEP while the tenants' applications were still pending under TOP and TIL. Okolie asserts that Howard said the City was able to circumvent legal challenges to the placement of City-owned buildings in NEP by transferring the buildings to NPHDFC before the buildings were even approved for placement and did so for the sole purpose of creating a legal basis to deny a tenant's previously submitted TOP application.

Defendants have submitted an affidavit from Howard in which he categorically denies having made the statements attributed to him. (Howard Aff. ¶ 7.) Howard avers that he was a junior attorney at the time who was not involved in any case, beside the instant matter, involving NEP or TOP, and that as a litigation attorney, he was not involved with the transactional aspects of any conveyance of City-owned property under any DAMP program. (*Id.* at ¶¶ 7, 8.) Defendants argue that Howard's alleged comments thus are inadmissible both because they are vague and inauthentic because they seemingly are based on second-hand knowledge, but assert that even accepting them as true, summary judgment still is warranted.

## D. Related Proceedings

This action is not the only one in which Okolie has had the opportunity to assert claims and defenses in relation to the events described above. Most significant for present purposes is the commercial tenant holdover proceeding brought against him, *see Neighborhood Partnership Development Fund Corp. v. Okolie,* 2003 WL 1923731 (App. Term Jan. 24, 2003) (the "holdover proceeding"). Okolie

acknowledges that after HPD placed the Wilson Avenue property in NEP, the City informed him that he would need to vacate and ultimately initiated the holdover proceeding to evict him when he refused to leave. (Okolie Aff. ¶ 37.) In 2003, Supreme Court, Appellate Term affirmed the judgment of the Kings County Civil Court granting plaintiff's landlord possession of his commercial unit in the building. *Neighborhood P'ship Hous. Dev. Fund Corp.,* 2003 WL 1923731, at *1.

Plaintiff also instituted at least one action for damages and a preliminary injunction in state court against NPHDFC; it appears Supreme Court denied plaintiff's request for the preliminary injunction and, in light of the outcome of the holdover proceeding, the appeal from that denial was dismissed as academic. *See Okolie Cyril v. Neighborhood P'ship Hous. Fund Inc.,* 309 A.D.2d 828, 766 N.Y.S.2d 66 (2d Dep't 2003).

Finally, in this district, Okolie sued NPHDFC and Bushwick for, *inter alia,* unfair housing practices in violation of the FHA and for discrimination in violation of § 1983. In a Summary Order dated July 25, 2005, the Second Circuit affirmed the district court's dismissal of Okolie's complaint for failure to state a claim upon which relief could be granted. *Okolie Cyril v. Neighborhood P'ship II Hous. Dev. Fund, Inc.,* 124 Fed.Appx. 26 (2d Cir. Jan. 25, 2005).

## II. DISCUSSION

### A. Standard for Summary Judgment

Under the Federal Rules of Civil Procedure, a district court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court's responsibility in assessing the merits of a summary judgment motion is thus not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.,* 73 F.3d 13, 16 (2d Cir.1995) (quoting *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984)). Accordingly, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, *see, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005), and the evidence presented will be construed liberally in favor of the party opposing the motion, *see, e.g., Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden then shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to satisfy its burden and defeat a motion for summary judgment. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). If the evidence favoring the nonmoving party is "merely colorable ... or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

**B. The Due Process Claim**

▉ Okolie brings a claim pursuant to 42 U.S.C. § 1983 alleging, among other things, that defendants violated his due process rights under the United States Constitution.[7] It is axiomatic that the "requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, the threshold question for a claim that alleges a violation of due process, such as plaintiff's, is whether the complaining party possessed a liberty or property interest protected by the Constitution. *Id.* Construing his submissions liberally in light of his *pro se* status, Okolie's due process argument appears to be two-pronged.

First, Okolie argues that he was unconstitutionally deprived of a property interest in his commercial tenancy when defendants failed to properly administer NEP and TOP and evicted him from the building. Second, plaintiff claims that he possessed a cognizable property interest entitling him to purchase the building through TOP, but was deprived of that interest by defendants' deficient administration of NEP and TOP. For the reasons discussed below, each argument fails as a matter of law.

**1. Plaintiff's Argument Based on His Commercial Tenancy**

Okolie argues that his "business and investments" in his commercial leasehold were property interests protected by the Constitution and asserts that, by failing to properly administer their housing programs and ultimately evicting him from the building, defendants deprived him of his rights without due process. (*See, e.g.,* Pl.'s Mem. Opp. Summ. J. at 14.) However, because plaintiff already has been afforded a full and fair opportunity to be heard on this argument when he chal-

---

**7.** The Equal Protection component of Okolie's § 1983 claim is discussed in Part II.C., *infra.*

lenged—unsuccessfully—the circumstances of his eviction in state court, it must fail again here.

The Full Faith and Credit Act requires federal courts to give a state court judgment the same preclusive effect that it would receive in the courts of the state in which it was rendered. 28 U.S.C. § 1738; *Hoblock v. Albany Co. Bd. of Elec.*, 422 F.3d 77, 93 (2d Cir.2005). Therefore, New York preclusion law applies in this action. *Hoblock*, 422 F.3d at 93.

■ Under New York law, the doctrine of *res judicata* gives "binding effect to the judgment of a court of competent jurisdiction and prevents the parties to an action, and those in privity with them, from subsequently relitigating any questions that were necessarily decided therein." *Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir.1997) (internal quotations omitted). Put another way, "[u]nder the 'transactional analysis' approach adopted by the [New York] Court of Appeals, the doctrine of *res judicata* . . . operates to preclude the litigation of matters that could have or should have been raised in a prior proceeding arising from the same factual grouping, transaction, or series of transactions." *Id.* (internal quotations omitted); *see also Cornwall Warehousing Inc. v. Town of New Windsor*, 238 A.D.2d 370, 371, 656 N.Y.S.2d 329, 330 (2d Dep't 1997) ("once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy"). For *res judicata* to attach, it matters not that, as here, the party attempting to relitigate a matter seeks to do so by pursuing a claim for relief under § 1983. *See, e.g., Mac Pherson v. State Street Bank & Trust Co.*, 452 F.Supp.2d 133, 140–41 (E.D.N.Y.2006) (finding that *res judicata* barred § 1983 claim against bank that foreclosed on plaintiff's home where claim was or could

have been raised in prior state court proceeding that sought to set aside foreclosure); *see generally*, Martin A. Schwartz & Kathryn R. Urbonya, *Section 1983 Litigation* 165 (2d ed.2008) ("[u]nder the full-faith and credit statute, 28 U.S.C. § 1738, federal courts in § 1983 actions must give state court judgments the same preclusive effect they would receive in state court under state law") (citing *Migra v. Warren City Sch. Dist.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)).

■ The parties do not dispute that, at the time he claims he was unconstitutionally damaged by defendants, Okolie possessed a month-to-month commercial tenancy in the building. Nor is there any dispute that after the building's transfer into NEP, the City informed Okolie that he would need to vacate, and that ultimately the City initiated the holdover proceeding to evict him when he refused to leave. The holdover proceeding, however, provided plaintiff the opportunity to oppose his eviction on whatever (nonfrivolous) grounds he believed relevant, and it was there that Okolie could have and should have raised the due process claim he raises here relating to his alleged property interest flowing from and hinged to the very tenancy that was the subject of the Civil Court proceeding. *See Robinson v. Lindsay Park Hous. Corp.*, No. 00–CV–6305, 2001 WL 483493, at *7–8 (E.D.N.Y. May 8, 2001); *Henderson v. Popolizio*, 76 N.Y.2d 972, 975, 563 N.Y.S.2d 733, 565 N.E.2d 482 (1990). Critically, Okolie lost the Civil Court proceeding, resulting in the dispossession order, which was affirmed on appeal, *see Neighborhood P'Ship Hous. Dev. Fund Corp.*, 2003 WL 1923731, at *1, that terminated all of his tenancy rights. Stated differently, the state court litigation and its adverse decision extinguished not only Okolie's claim to tenancy but also necessarily decided adversely all defenses to

eviction, including any due process claim relating to Okolie's alleged property interest in the building which was founded on his tenancy. *See Robinson,* 2001 WL 483493, at *7–8; *Cornwall Warehousing Inc.,* 238 A.D.2d at 371, 656 N.Y.S.2d at 330; *Brooklyn Welding Corp. v. City of New York,* 198 A.D.2d 189, 189–90, 604 N.Y.S.2d 87 (1st Dep't 1993); *see also Golkin v. Abrams,* 803 F.2d 55, 57 (2d Cir.1986) (applying *res judicata* to plaintiffs' constitutional claims in federal court action where plaintiffs could have raised their claims in prior state court proceeding where they had been defendants). Okolie is free to disagree with that outcome, but he is not free from its preclusive effect here. Okolie's Civil Court loss is dispositive of the due process claims he asserts in this action, insofar as they relate to the termination of his tenancy in the building, along with any other property right hinged to it.

■ Even if the commercial tenancy prong of Okolie's claim were not barred by *res judicata,* moreover, it still would be subject to summary dismissal because plaintiff did not even possess a constitutionally protected right to a continued commercial tenancy. *Roth,* 408 U.S. at 569–70, 92 S.Ct. 2701. Okolie does not dispute that his tenancy in the building was renewable month-to-month. In fact, he actually proffers as evidence a copy of his lease which indicates that it "may be terminated at any time, with or without cause, by either party upon the giving of thirty days' notice." (Pl.'s Ex. C at 2); *see also* N.Y. Real Prop Law § 232–a. Under such circumstances, Okolie could have no legitimate claim of entitlement to remain in possession after notice of termination. *See U.S. v. Schmitt,* 999 F.Supp. 317, 361 (E.D.N.Y.1998); *Adams Parking Garage, Inc. v. City of Scranton,* 171 F.Supp.2d 417, 424–25 (M.D.Pa.2001), *aff'd,* 33 Fed. Appx. 28 (3d Cir.2002). As the submissions before the Court do not raise any issue of material fact as to the propriety of the notice to terminate the lease Okolie received from HPD or its assign, Bushwick, this lawful termination of his commercial tenancy in the building completely and independently extinguished any property interest Okolie had in the building and undermines any related due process claim.

## 2. Plaintiff's Argument Based on His Offer to Purchase

Notwithstanding the propriety of any court-ordered termination of his tenancy, Okolie advances a distinct theory of liability based on his offer to purchase the Wilson Avenue property through TOP. In short, Okolie claims that he enjoyed a right to purchase the building under TOP, but was deprived of that right without due process as a result of the City's "procedurally deficient administration of ... TOP and NEP." (Pl.'s Mem. Opp. Summ. J. at 11.) On this score, defendants contend that they are entitled to summary judgment because, as a matter of law, Okolie possessed no cognizable property interest under TOP that was entitled to constitutional protection in the first place.

■ Again, the threshold question for a due process claim is whether the plaintiff enjoyed a liberty or property interest protected by the Constitution. *Roth,* 408 U.S. at 569–70, 92 S.Ct. 2701; *Zahra v. Town of Southold,* 48 F.3d 674, 680 (2d Cir.1995). "A property interest does not exist solely because of the importance of the benefit to the recipient." *Kelly Kare, Ltd. v. O'Rourke,* 930 F.2d 170, 175 (2d Cir.1991). Nor is it sufficient that a person have a "unilateral expectation" of a right. *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. Rather, a plaintiff must demonstrate a "legitimate claim of entitlement" to a property interest in order to receive the protections of due process. *Id.* In the Second Circuit, a

plaintiff will be found to have a "legitimate claim of entitlement to a particular benefit if, absent the alleged denial of due process, there is a certainty or a very strong likelihood that the benefit would have been granted." *Gagliardi v. Village of Pawling,* 18 F.3d 188, 192 (2d Cir.1994); *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 59 (2d Cir.1985). The question of the existence of a property right thus turns on "the extent to which the deciding authority may exercise discretion in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision." *Zahra,* 48 F.3d at 680. Where a decision-maker retains discretion over whether to grant the benefit at issue, a plaintiff is not normally entitled to that benefit. *Gagliardi,* 18 F.3d at 192. "[A]n entitlement ... arises only when the discretion of the issuing agency is so narrowly circumscribed as to virtually assure conferral of the benefit." *Id.*

■ Plaintiff's contention that he possessed a right to purchase the building under TOP is unpersuasive when measured against this standard. HPD's TOP brochure, a document on which both sides rely (*see* Defs.' Ex. H; Pl.'s Ex. B), explicitly makes any potential purchase under TOP contingent on several factors within HPD's discretion, and subject to approval by multiple City decision-makers. To begin, a TOP applicant is permitted to purchase only an "eligible" building. But HPD determines eligibility: the TOP brochure defines such a building, in part, as one where rehabilitation is either not required or—if necessary—is both "technically and financially feasible" for the applicant, leaving judgment on this fundamental question to HPD. (Defs.' Ex. H at 2.; Pl.'s Ex. B at 2; *see also* Walters Aff. ¶¶ 17, 19, 21.) Likewise, HPD retains discretion over the eligibility of the applicants as well. Defendants assert, and plaintiff does not point to any evidence to dispute it, that public financing is unavailable to assist TOP applicants in purchasing or rehabilitating their buildings. As an understandable consequence, and as is also undisputed, a TOP applicant must demonstrate a present ability to purchase an eligible building at market price through private financing. (Defs.' Ex. H at 1; Pl.'s Ex. B at 1; Walters Aff. ¶¶ 17, 21.) Whether an applicant has sufficiently demonstrated an ability to pay is a question reserved for HPD. (Walters Aff. ¶¶ 17, 21.) Finally, defendants note—and plaintiff again does not challenge—that any potential sale under TOP ultimately must be approved not only by the Mayor, who has responsibility for executive agencies, but also the City Council, the legislative branch of municipal government. (Defs.' Ex. H at 1; Pl.'s Ex. B at 1.) Such discretionary review by elected officials convincingly cuts against a finding of entitlement. *See Coney Island Resorts, Inc. v. Giuliani,* No. 00–CV–2233, 2000 WL 804636, at *6 (E.D.N.Y. May 10, 2000) (no property interest in development of City-owned property where, *inter alia,* "approval was necessary at various stages in the process ... and there was no guarantee it would be forthcoming, even in the exercise of good faith") (quoting *Waltentas v. Lipper,* 636 F.Supp. 331, 336 (S.D.N.Y.1986) (no entitlement to develop government-owned property where final approval of application was contingent on sign-off from the New York City Board of Estimate and the mayor)).

On the undisputed facts, HPD's discretion in administering TOP is not nearly so circumscribed so as to have "virtually assure[d] conferral of the benefit" of the building purchase to Okolie absent the alleged denial of due process. *Gagliardi,* 18 F.3d at 192. Defendants' motion for summary judgment on the due process claim relating to Okolie's alleged right to pur-

chase the Wilson Avenue property is, therefore, granted as a matter of law.

## C. Claims Requiring Evidence of Intentional Discrimination

In addition to his due process claims, Okolie also asserts various other federal causes of action stemming from his unsuccessful bid to purchase the building, including an equal protection claim under § 1983 and claims under sections 1981, 1982, and Title VI. While the elements of these claims vary, each requires proof of intentional discrimination. *See, e.g., Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir.2000) (race-based equal protection claim requires intentional discrimination); *Rivera v. U.S.*, 928 F.2d 592, 607–08 (2d Cir.1991) (same for sections 1981 and 1982); *Scaggs v. New York Dep't of Educ.*, No. 06–CV–0799, 2007 WL 1456221, at *11 (E.D.N.Y. May 16, 2007) (same for Title VI). Thus, in opposing defendants' motion for summary judgment, Okolie must provide sufficient evidence to raise a genuine issue of material fact concerning defendants' intent to discriminate against him. *See, e.g., Grillo v. New York City Trans. Auth.*, 291 F.3d 231, 234 (2d Cir.2002). In performing its analysis, the Court must construe the evidence in the light most favorable to Okolie but remain mindful that "conclusory allegations or unsubstantiated speculation" will not provide a basis on which to deny defendants' motion. *Scotto*, 143 F.3d at 114.

Okolie contends that when he first talked to Paikoff about purchasing the Wilson Avenue property (over the telephone) in the spring or summer of 1997, Paikoff was receptive to his overtures and, regardless, did not alert him to any potential problems with his offer or eligibility. However, plaintiff claims that the tenor of their interaction changed when, in January or February 1998, they met in person for the first time. According to Okolie, Paikoff seemed surprised to discover that he was a Black African and began their conversation by asking him, "where is your accent from?" (Okolie Aff. ¶ 21.) Okolie infers from the timing and nature of this question, and from Paikoff's subsequent inquiry concerning Okolie's access to funds that would enable him to purchase the building under the terms and conditions of TOP, that Paikoff was discriminating against him because of his race. (*Id.* at ¶ 22.) Finally, Okolie suggests that "Paikoff seemed unwilling to listen" to him and abruptly ended the meeting, telling him he would get back to him regarding his application. (*Id.* at ¶ 23.)

When asked at his deposition what led him to believe Paikoff was discriminating against him based on his race, Okolie stated, "[w]hen I put my application in, I did not know that my race was going to be an issue at all. . . . I do not know what Mr. Paikoff's background is, what his personal perception of black people is. I do not have a clue." (Okolie Dep. Tr. at 125:22–126:12.) In response to a similar question, Okolie elaborated that he believed that Paikoff discriminated against him:

> Because I met with him in person. He know [sic] what my race is, and he promised, and he agreed that he will consider my application, and he gave me an application to fill out, so by him going against all the facts and the things that he said he was going to do, his action was prejudicial.

(Okolie Dep. Tr. at 126:25–127:10.)

Accepting Okolie's rendition of events as true, his discrimination claims must fail because they are wholly speculative. Save for Paikoff's ability to observe face-to-face that Okolie was Black and his single query concerning the origination of Okolie's accent—itself totally race-neutral in the context of an in-person meeting— Okolie cannot point to a single piece of direct evidence to even suggest that Pai-

koff or any other City employee harbored racial animus. Indeed, Okolie's own admissions undercut his conclusory allegations. Plaintiff admits Paikoff never used a racial slur in his presence (Okolie Dep. Tr. 124:19–21), he does not assert that Paikoff made any other comment concerning his accent or his race whatsoever, and he professes that he did "not have a clue" about Paikoff's "personal perception of black people" (*id.* at 126:7–11). Rather, he bases his claims on the assumption that because Paikoff knew his race and, in plaintiff's view, should have otherwise granted his application but did not, Paikoff must have been improperly motivated by race. Point blank, there is not a shred of credible evidence in the record to support such a conclusory assumption or a jury finding of intentional discrimination.[8] *See Catanzaro v. Weiden,* 188 F.3d 56, 64–65 (2d Cir.1999); *Orange Lake Assocs. v. Kirkpatrick,* 21 F.3d 1214, 1227 (2d Cir. 1994); *Reyes v. Erickson,* 238 F.Supp.2d 632, 638–39 (S.D.N.Y.2003).

Nor is plaintiff aided by his reliance on HPD Assistant Commissioner Walters's admission concerning the administration of TOP. In his affidavit, Walters stated that:

the City will not sell to tenants buildings [such as the Wilson Avenue property] which are dilapidated and in need of substantial structural renovation. Tenant owners under TOP do not have access to the extensive public funding required for extensive renovations and thus, would be unable to cure the very conditions which led [the City to take possession through foreclosure in the first place] and could easily do so again. Thus, ownership under TOP remains limited to buildings requiring minimal renovation and with no need for the extensive public money, rent subsidies and technical assistance available under NEP.

(Walters Aff. ¶ 21.) According to Okolie, Walters's statement evidences an impermissible discriminatory policy based on the "unwarranted and invidious . . . assumption" that tenants of City-owned buildings—who, he claims, are often members of minority racial groups—do not have access to "extensive public funding" required for the purchase and renovation of buildings owned by City. (Pl.'s Mem. Opp. Summ. J. at 16–17.)

This argument is flawed in several respects. First, plaintiff's conclusory interpretation of Walters's statement misapprehends its plain language and is

---

**8.** It is of little moment that Paikoff asked Okolie, consistent with the TOP brochure, whether he had access to funds that would enable him to purchase the building. Okolie's inability to marshal any direct evidence of discrimination does not permit a reasonable jury to read into Paikoff's facially neutral and perfectly legitimate—indeed, required—question an actionable invidious intent. *See Yusuf v. Vassar College,* 35 F.3d 709, 713–14 (2d Cir.1994). Nor does plaintiff raise a material issue of fact with the vague allegation that, prior to his in-person inquiry into Okolie's funding, Paikoff had assured plaintiff that he was satisfied with his funding to buy the building at market price and to "complete renovations that the Plaintiff had already begun making to the Building in 1996." (Pl.'s Mem. Opp. Summ. J. at 17.) Assuming Pai-

koff did agree that plaintiff possessed the funding to complete the renovations that he "had already begun making to the Building in 1996," at a time when plaintiff was a commercial tenant occupying only one of the building's six units, that statement does not speak to the relevant question of whether he could afford, as required by TOP, to remedy the dilapidated conditions found throughout the building as a whole—conditions which the parties agree were still present at least as late as June 1997. (*See* Pl.'s Ex. F.) Stated differently, even if Paikoff flat out reversed his position regarding Okolie's application to acquire the building under TOP, that does not alter in the slightest a record that is absolutely devoid of proof of any invidious race-based discrimination.

contradicted by the record evidence. As Walters's Affidavit and the TOP Brochure make clear, Walters's statement that TOP applicants do not have access to extensive public funding is not the product of an invidious, racially-charged assumption that applicants somehow will not be able to obtain it; it is based on an averred City policy manifested in the express terms of the program which specifically declines to make extensive public funding available—and therefore requires applicants to demonstrate their ability to rely on their own or other private financing instead. (Defs.' Ex. H at 1; Pl.'s Ex. B at 1; Walters Aff. ¶¶ 17, 21.)

■ Second, if what plaintiff really intends to object to is HPD's discretion—or, more specifically, HPD's freedom to determine which buildings are eligible for TOP and in so doing, to conclude that privately-financed or self-financed tenants living in noneligible buildings necessarily are unable to fund required renovations—his argument still must fail. Both Walters's statement and the TOP brochure are race-neutral on their face, Okolie's conclusory assertions to the contrary notwithstanding. (*See* Okolie Aff. ¶¶ 40, 42.) Most critically, plaintiff provides absolutely no probative evidence that would allow a reasonable juror to conclude that HPD exercised its allotted discretion in an intentionally discriminatory fashion. *See Brown*, 221 F.3d at 337 (where policy is facially neutral, plaintiff may prevail by showing that policy has been applied in an intentionally discriminatory manner). Furthermore, although evidence of a facially neutral policy's disparate impact on minorities is generally insufficient to prove discrimination on its own, *see Village of Arlington Heights v. Metropolitan Housing Develop-*

*ment Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (disproportionate impact "is not the sole touchstone" of invidious discrimination, but where there exists a "clear pattern, unexplainable on grounds other than race," intent may be inferred) (quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)), the record solidly suggests there was no such disparate impact here anyway. Indeed, plaintiff offers absolutely nothing pointing to any broader pattern showing that HPD's administration of TOP has had a disparate impact on minorities. *See Catanzaro*, 188 F.3d at 65 (conclusory allegations that city's housing programs had discriminatory impact did not support equal protection violation). Defendants, quite to the contrary, offer uncontested business records maintained by HPD establishing that of the 51 buildings sold under TOP between May 1995 and October 2000 more than 84% of tenant purchasers were nonwhite.[9] (*See* Defs.' Ex. O.) Finally, Okolie's otherwise unsupported contention that defendants' former lawyer effectively admitted to a policy of "refusing to transfer City-owned property to minority tenants in poor neighborhoods" (Okolie Aff. ¶ 31) is insufficient to sustain his discrimination claims. Assuming any such statement was made, plaintiff's assertions about it are largely vague and nonspecific as to who or what agency in the "City" had such a policy. Far more significantly, moreover, mere words of a lawyer during an out-of-court colloquy, even if they were to suggest a racial animus, cannot defeat concrete evidence to the contrary—that 84% of all successful TOP applicants were minority tenants living in economically disadvantaged circumstances. Particularly in the teeth of such uncontested proof showing the opposite, bald claims

---

**9.** Nor does plaintiff offer any evidence to indicate that HPD's placement of the building in

NEP had a discriminatory effect.

of racial motivation provide a jury with no basis on which to impute to defendants an invidious intent to discriminate based on race. *See Reyes*, 238 F.Supp.2d at 639 ("naked assertions" of racial animus insufficient to state a claim for discrimination).

For all of these reasons, defendants' motion for summary judgment on all intentional discrimination claims is granted and Okolie's § 1983 equal protection claim and claims under sections 1981, 1982, and Title VI are dismissed.

## D. The FHA Claim

In contrast, in order to prevail on his claim under the FHA, Okolie need not prove that discrimination was intentional. *Orange Lake Assocs.*, 21 F.3d at 1227–28. Rather, he must show that defendants' actions had a "discriminatory effect, either through an 'adverse impact on a particular minority group,' or through 'harm to the community generally by the perpetuation of segregation.'" *Catanzaro*, 188 F.3d at 65 (quoting *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir.1988)).

As already noted, plaintiff has proffered conclusions but no evidence to show that his unsuccessful bid to purchase the building was the product of an HPD program—whether it be TOP or NEP—that defendants administered to discriminatory effect. Quite the reverse, it appears from the only evidence submitted that nonwhite applicants purchased the lion's share of TOP-eligible buildings between May 1995 and October 2000. (*See* Defs.' Ex. O.) With respect to NEP, Okolie has provided no evidence to show that DAMP's placement of buildings in NEP worked a discriminatory result, or that,

subsequent to placement, tenants of NEP buildings were treated in a discriminatory fashion. Okolie's FHA claim therefore must be dismissed.[10]

## E. The State Law Claims

Okolie's remaining claims for relief arise under New York law, N.Y. Exec. Law § 290 *et seq.* Under the federal supplemental jurisdiction statute, a district court "may decline to exercise supplemental jurisdiction" over state law claims where, as here, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). While, as a "general proposition ... if all federal claims are dismissed before trial ... the state claims should be dismissed as well," this rule is not mandatory. *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir.2004) (quoting *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir.1991)). A district court, weighing considerations of judicial economy, convenience, fairness, and comity, may in its discretion, choose to retain jurisdiction over a party's state claims. *Id.; Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305–06 (2d Cir.2003).

In this case, considerations of judicial economy, convenience, fairness, and comity strongly favor the exercise of supplemental jurisdiction over Okolie's state claims. This case has recently entered its eleventh year. Discovery is complete, the parties have submitted extensive cross-motions for summary judgment, and the parties and the Court all have spent considerable time dealing with the legal issues and facts raised by plaintiff's claims. It would make little sense to leave the parties to state court to litigate, so long after the

---

**10.** The parties engage at length the question of whether Okolie, as a nonresidential tenant who does not represent housing interests and who sought to purchase the Wilson Avenue property as a commercial venture, has stand-

ing to assert a claim for housing discrimination under the FHA. However, the Court need not reach the issue, for even assuming, *arguendo*, that Okolie has standing, his claim fails.

fact, claims that already have been fully ventilated here. This is especially true where, as here, plaintiff's standard-issue state law claims involve no novel questions of state law and thus do not raise concerns over comity. In light of these considerations, then, the Court will exercise supplemental jurisdiction over Okolie's state claims. *See Ametex Fabrics, Inc. v. Just In Materials, Inc.,* 140 F.3d 101, 105–06 (2d Cir.1998) (district court did not abuse its discretion in exercising supplemental jurisdiction where discovery and a settlement conference had taken place); *Shelter Inc. Realty v. City of New York,* No. 01–CV–7015, 2007 WL 29380, at *14 (E.D.N.Y. Jan.4, 2007) (exercising supplemental jurisdiction over state claims under NYSHRL at summary judgment); *Drake v. Lab. Corp. of America Holdings,* 290 F.Supp.2d 352, 375 (E.D.N.Y.2003).

 Claims of discrimination under § 296(5) of NYSHRL, such as those asserted by Okolie in this case, are analyzed under the same framework as is used for the FHA. *Elmowitz v. Executive Towers at Lido, LLC,* 571 F.Supp.2d 370, 376 (E.D.N.Y.2008). Therefore, for the same reasons Okolie's FHA claim must be dismissed, his claims under NYSHRL must be, and hereby are, dismissed as well.

## III. *CONCLUSION*

For the foregoing reasons, the Court grants defendants' motion for summary judgment as to all of plaintiff's claims and denies in its entirety Okolie's cross-motion for summary judgment. The Clerk of the Court is directed to enter Judgment for defendants, without costs to any party, and to close this case.

SO ORDERED.