Stephen M. CATANZARO; Warren
Kautz; and Rashon Lal,
Plaintiffs–Appellants,

v.

Sara WEIDEN, Defendant,

City of Middletown, New York; Hyman
Weiden; Joseph M. Destefano, Esq.,
Mayor, sued in his Official and Individual Capacities; Alfred A. Fusco,
sued in his Official and Individual Capacities, Defendants–Appellees.

No. 97–7140.

United States Court of Appeals,
Second Circuit.

Argued Oct. 14, 1998.

Decided July 28, 1999.

Michael H. Sussman, Goshen, N.Y. (Stephen Bergstein, Law Offices of Michael H. Sussman, Goshen, NY, of counsel), for Plaintiffs–Appellants.

Robert N. Isseks, Middletown, N.Y. (Alex Smith, Middletown, N.Y. and Rosenstein, McKenna & Bonney, Middletown, NY, of counsel), for Defendants–Appellees.

Before: KEARSE, PARKER and KEITH,* Circuit Judges.

PARKER, Circuit Judge:

This action was brought under 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"). Plaintiffs–Appellants allege that Defendants–Appellees, City of Middletown, Mayor Joseph DeStefano, and Alfred Fusco, the Middletown Commissioner of Public Works, violated their due process property rights when they demolished Plaintiff–Appellant Catanzaro's apartment buildings before determining whether the buildings

* Honorable Damon J. Keith, Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

were structurally unsound. The district court found that the negligent demolition of Plaintiffs–Appellants' building without a predeprivation hearing, pursuant to emergency procedures authorized under the city ordinance, did not violate Plaintiffs–Appellants' due process or equal protection rights. Plaintiffs–Appellants appeal that ruling, contending that material issues of genuine fact exist to permit a rational jury to conclude that Defendants–Appellees violated their civil rights.

## I. BACKGROUND

Plaintiff–Appellant Stephen Catanzaro was the owner of two adjacent three-story buildings that shared a common wall. These buildings were located at 82 and 84 East Main Street, respectively, in the city of Middletown, New York. The buildings were constructed of brick walls and wooden joists and partitions, and housed stores on the street level and walk-up apartments above. In total, the two buildings contained a deli, a bar, and eight low-income apartments. Plaintiff–Appellant Rashon Lal was a tenant in one of the buildings, and Plaintiff–Appellant Warren Kautz (who died prior to the district court's decision), owned a building next door at 80 East Main Street.

On Sept. 1, 1994 at approximately 2:30 p.m., a car driven by Hyman Weiden crashed into the bar on the first floor of 84 East Main Street. Officer Paul Rickard was the first on the scene. Rickard observed that Weiden's car had driven through the front wall and windows of the bar, knocking down the cast iron supports. He heard the building creaking and noticed that it was starting to buckle, and that the brick wall was starting to separate. He requested assistance to evacuate the building. Defendant–Appellee DeStefano, the Mayor of Middletown, was notified that there was a possible building collapse on East Main Street. DeStefano drove over to the site in his own car, where he was told that only the driver had

been seriously hurt and that the building had been evacuated.

Defendant–Appellee Alfred A. Fusco, the Commissioner of Public Works for the City of Middletown, was one of the next officials on the scene, arriving sometime between 3:30 p.m. and 4:00 p.m. He was told by Officer Rickard that there had been no cracks in the front facade when he had arrived, but that now there were one-inch cracks. According to Fusco's account, "[i]t was apparent that the front of the building was severely compromised and could fall into the public street which was only five feet (5') from the building." The City Building Inspector, Ellington Bradford, also noted that the cracks were widening, and that the beam that had been supported by one of the iron supports was sagging. According to William M. Johnson, the City's Deputy Commissioner of Public Works, "Commissioner Fusco, Phil Pingotti (then Street Superintendent of Public Works) and I decided that 84 East Main had to be immediately demolished because of the condition of the front wall and the type of structure of the building would have created a domino effect of destruction of the building. Because there were power lines close to the front wall, we feared that any collapse of that wall-the main floor beams ran crossways from east to west through the building, so that removal of the front wall first would cause an even greater hazard involving the power lines." The city officials also noted that blocking the street would have decreased accessibility to and from both a hospital and a firehouse.

Catanzaro and his father were immediately summoned. Fusco claims that "neither Catanzaro made any protest about the demolition of the obviously dangerous and crumbling building. Stephen Catanzaro's repeatedly stated concern was his ability to salvage as much personal property as possible from the structure." After obtaining Catanzaro's consent, the city officials rented equipment and worked until dark razing the building, pursuant to an

emergency procedure that is expressly authorized by the Charter and Code of the City. DeStefano, who knew Catanzaro as a "frequent attendee of common council meetings," noted that Catanzaro was "very upset about the accident" and says he "tried to calm him down." DeStefano adds, "My purpose for being there was regarding the tenants and to make sure that people were protected. Any issue dealing with property was referred to Mr. Fusco."

Catanzaro paints a slightly different version of events, one in which DeStefano "was overheard to refer to the result obtained, with satisfaction, if not pleasure, as 'instant urban renewal.'"[1] Drawing an adverse inference from this comment, Appellants allege that the claimed necessity for emergency demolition was pretextual, "because defendants were allegedly attempting thereby to rid the City of housing opportunities for the poor and racial minorities by slowly reducing the low income housing structures available, and that the tenants were in fact members of racial or ethnic minority groups."

On Sept. 2, 1994, the day after 84 East Main Street had been destroyed, Fusco, Bradford, the Junior Engineer for the City, and a private consulting engineer examined the adjacent building at 82 East Main Street. They determined that damage to the party wall between 82 and 84 East Main Street required 82 East Main Street to be either immediately repaired or torn down.[2] Catanzaro claimed that he could not afford to repair the building and signed a consent form, now alleged to have been "coerced," for the building to be destroyed. Catanzaro claims that he "urged DeStefano and Fusco not to demolish the second building . . . and, instead, to consult with experts as to the appropriate course

of action," but that DeStefano and Fusco "refused to allow Catanzaro any time to evaluate the situation," and that DeStefano "threatened . . . Catanzaro with arrest and indicated he wished to teach him a lesson for suing the City [a suit which arose from what Catanzaro claimed was a false arrest]." The building was then demolished. At some point, these demolitions caused damage to 80 East Main Street, which was owned by Plaintiff–Appellant Kautz.

Plaintiff–Appellants claim that there had, in fact, been no emergency on Sept. 1, 1994, the day the car hit 84 East Main Street, since the car had only damaged the exterior, or facade, of the building and did not undermine its structural integrity. Appellants note that, when the car was towed out of the building, the building did not collapse. Appellants also submitted to the District Court an affidavit from Aaron Horowitz, a professional engineer, who examined photographs taken at the scene and said he saw "little or no buckling or sagging of either the facade or any other part of the building." Since the columns knocked out supported a facade and not a load-bearing wall, Horowitz said, the damaged columns could have been replaced. Instead, Horowitz claimed, Fusco failed to perform an actual engineering evaluation of 84 East Main Street; "[h]e failed to check floor joists and columns supporting the building; he did not ascertain whether the facade was a supporting wall; he never assessed whether it could be temporarily supported; and he failed to make calculations to determine whether the damage was serious enough to cause total failure of the building." Horowitz further attested that the demolition contractor who demolished 84 East Main Street failed to exercise proper care, which led to the destruction of the party wall that necessitated the demolition of 82 East Main Street. Horo-

---

1. According to Appellants' Amended Complaint, DeStefano, in announcing to Catanzaro that the building would be razed, said, "[T]hese buildings are coming down. We are going to show you what instant urban renewal is all about."

2. Catanzaro alleges that the destruction of the party wall was due to Fusco's choice of Boyce Excavating, which does not have expertise in building demolition and which used a backhoe that destroyed the wall.

witz was not present at either demolition and made this assessment based solely on the photographs.

Appellants have further asserted that Mayor DeStefano is attempting to drive out poor minorities by making low-income housing unavailable, and that the city's destruction of Catanzaro's property was in keeping with this "calculated campaign." Between 1994 and 1996, the city closed or destroyed 48 buildings because they were "[i]llegal, unsafe housing," while approximately 6 new low-income units were approved by the city board (a decision in which Mayor DeStefano played no part). Since taking office, DeStefano has also signed new city ordinances that make it slightly more difficult to create new low-income housing projects. DeStefano claims that the ordinances help insure that housing is adequately safe.

Appellants also claim that DeStefano has stated publicly that Middletown houses "too many of Orange County's poor." Appellants have submitted an affidavit from a property owner named Paul Hanson, who says that, over the past several years, "the City has systematically harassed the owners of boardinghouses even when they are in full compliance with the law." The Regional Economic Community Action Program (RECAP) has filed a complaint with the U.S. Department of Housing and Urban Development (HUD), charging the City and DeStefano with discrimination against persons with disabilities in violation of the Fair Housing Act and the Americans with Disabilities Act for their refusal to allow RECAP to establish housing for homeless persons with disabilities.

Plaintiffs–Appellants have presented no evidence to establish that either DeStefano or Defendant–Appellee Fusco were aware of the names or racial or ethnic background of any of the tenants residing at 84 or 82 East Main Street prior to Sept. 1, 1994. Within Census Tract 15, in which both buildings were located, there were five times the number of whites below the federal poverty level as there were blacks

below that level, and twice the number of whites below the federal poverty level as Hispanics below that level.

The initial complaint in this suit was filed on August 31, 1995. There were originally three actions, one brought by Catanzaro, Kautz, and Lal, and two other actions brought by two groups of former tenants of 82 and 84 East Main Street. These actions were eventually consolidated. On October 27, 1995, Judge Brieant dismissed the action without prejudice as to Hyman and Sara Weiden, so Plaintiff–Appellants Catanzaro, Kautz, and Lal filed an amended complaint on August 12, 1996. In the amended complaint, Plaintiff–Appellants alleged violations of (1) procedural due process; (2) substantive due process; (3) equal protection; and (4) the Fair Housing Act. At the conclusion of pre-trial discovery, Judge Brieant found "no disputed issues of relevant fact" and granted Defendants' motion for summary judgment.

In general, Judge Brieant observed that "[t]his litigation dresses up in the form of a federal civil rights action, an ordinary tort case. . . ." Aside from the alleged comment about "instant urban renewal," Judge Brieant found that the events showed "at the most negligence or an error of judgment on the part of the officials." Moreover, drawing an adverse inference of intent or motive from the "urban renewal" comment had no effect on Plaintiffs' case, since "the Mayor who made the unfortunate allusion to urban renewal has no power under the Charter to make the decision to declare or demolish what was in effect a public nuisance."

Judge Briant dismissed all of Appellants' arguments in turn. Since New York provided an adequate post-deprivation legal remedy, there was no denial of procedural due process. Since the action was not "conscience-shocking or oppressive," there was no denial of substantive due process. Finally, there was no evidence of an equal protection violation, even if the

housing code impacted disproportionately on the poor, many of whom were minorities. Judgment was entered on December 20, 1996.

Plaintiffs–Appellants appealed to this Court on January 29, 1997. On appeal, they claimed that (1) they were denied both an opportunity to contest the determination that the building was a threat to public safety, and notice of the city's intent to destroy 84 East Main Street, in violation of their procedural due process rights; (2) Defendants had arbitrarily destroyed both buildings in violation of their substantive due process rights; (3) the City's housing policies discriminated against low income members of racial minorities, in violation of the Equal Protection Clause; and (4) the City's housing policies had a disproportionate impact on minorities, in violation of the Fair Housing Act. The case was assigned to now deceased Circuit Judge Frank Altimari, Circuit Judge Fred I. Parker and Circuit Judge Damon J. Keith of the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

In a March 17, 1998 opinion, this Court vacated and remanded the District Court's grant of summary judgment. *Catanzaro v. Weiden,* 140 F.3d 91 (2d Cir.1998)("*Catanzaro I* ").

Defendants–Appellees petitioned for a rehearing of the case on March 30, 1998. By then, Judge Altimari had become gravely ill, and Judge Kearse was thereafter designated to replace him on the panel. The reconstituted panel decided to grant the motion for rehearing, and the case was re-argued on October 14, 1998. Upon further consideration of the issues presented in this case, this Court now vacates its earlier decision and affirms the district court's decision to grant summary judgment.

## II. DISCUSSION

A district court's decision to grant summary judgment is reviewed by this Court *de novo. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We will reverse an order of summary judgment if there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact. *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988). Furthermore, we must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). However, even when we resolve all factual disputes in favor of Plaintiffs–Appellants, we find that the district court was correct to grant summary judgment to the Defendants.

### A. The Procedural Due Process Claim

Plaintiffs' first claim is based on 42 U.S.C. § 1983, and asserts that Defendants' actions deprived Plaintiffs of property without due process of law, in violation of the Fifth and Fourteenth Amendments. Plaintiffs make this claim as both a procedural and a substantive due process violation.

The analysis of the procedural due process claim begins with *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). *Parratt* holds that although notice and a predeprivation hearing are generally required, in certain circumstances, the lack of such predeprivation process will not offend the constitutional guarantee of due process, provided there is sufficient postdeprivation process. *Id.* at 538, 101 S.Ct. 1908. "[E]ither the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Id.* at 539, 101 S.Ct. 1908.

The question in this case is whether the *Parratt* exception applies, and is thus whether there was an emergency, and

whether adequate postdeprivation remedies were available. In *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the Supreme Court considered the constitutionality of an emergency procedure which allowed the Secretary of the Interior, acting through government inspectors, to order the immediate cessation of mining activities when an inspector perceived an immediate danger to public safety. The Court held that "[t]he relevant inquiry is not whether a cessation order should have been issued in a particular case, but whether the statutory procedure itself is incapable of affording due process." *Id.* at 302, 101 S.Ct. 2352.

In finding the procedure constitutional, the Court specifically noted that the procedure afforded the inspectors discretion to determine whether or not there was an emergency, and that this discretion, even coupled with the inherent possibility of its misapplication, did not offend due process: "[t]he possibility of administrative error inheres in any regulatory program; statutory programs authorizing emergency administrative action prior to a hearing are no exception." *Id.* The Court then quoted from *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950):

> Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.

*Hodel*, 452 U.S. at 303, 101 S.Ct. 2352. The Court did note, however, that this discretion is not absolute, and stated that "if a pattern of abuse and arbitrary action were discernable from review of an agency's administration of a summary proce-

dure," the application of the procedure may be unconstitutional. *Id.* at 302 n. 46, 101 S.Ct. 2352.

■ Although Plaintiffs in this case do not contest the constitutionality of the emergency demolition procedure invoked by the Defendants in ordering the demolition of the Buildings, and instead question whether that procedure was properly invoked, the application of the principles of *Hodel* to the Plaintiffs' claim nevertheless must be considered. In determining whether Defendants, in the person of Fusco, properly .invoked the emergency procedure, *Hodel* directs us to accord the decision to invoke the procedure some deference, and not to engage in a hindsight analysis of whether the damage to the buildings actually created an immediate danger to the public. Under *Hodel*, the due process guarantee is offended only when an emergency procedure is invoked in an abusive and arbitrary manner; therefore, there is no constitutional violation unless the decision to invoke the emergency procedure amounts to an abuse of the constitutionally afforded discretion. *See Hodel*, 452 U.S. at 302–03, 101 S.Ct. 2352.[3]

The Ninth Circuit has implicitly adopted a similar analysis, and affords some deference to officials charged with making a decision on whether or not to invoke an emergency procedure. *See Armendariz v. Penman*, 31 F.3d 860, 866 (9th Cir.1994) (holding that the rationale for permitting emergency deprivations does not apply "where the officials know no emergency exists, or where they act with reckless disregard of the actual circumstances"), *vacated in part on other grounds*, 75 F.3d 1311 (9th Cir.1996) (*en banc*). As noted by the majority in *Catanzaro I*, the Sixth Circuit has gone even farther, holding, in a case almost factually identical to this one, that where the emergency procedure itself

---

**3.** This principle is consistent with the general proposition that mere negligence can not constitute a due process violation. *See Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662,

88 L.Ed.2d 662 (1986) (noting that to hold that negligence could amount to a constitutional violation "would trivialize the centuries-old principle of due process of law").

is not challenged on a constitutional basis, the question whether or not the official made the correct decision in invoking that procedure is not of constitutional significance. *Harris v. City of Akron*, 20 F.3d 1396, 1404–05 (6th Cir.1994).

We do not mean to suggest that the government may simply avoid affording due process to citizens by arbitrarily invoking emergency procedures; *Hodel* clearly declares such actions unconstitutional. However, where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion.

This somewhat deferential standard finds strong support in policy considerations. The law should not discourage officials from taking prompt action to insure the public safety. By subjecting a decision to invoke an emergency procedure to an exacting hindsight analysis, where every mistake, even if made in good faith, becomes a constitutional violation, we encourage delay and thereby potentially increase the public's exposure to dangerous conditions. This quandary is exactly what these emergency procedures are designed to prevent, and is the primary reason they are constitutionally acceptable.

If an official believes that the public is in immediate danger, he or she should not hesitate to invoke an emergency procedure for fear of being sued, and being liable for damages should his or her decision turn out to be incorrect in hindsight. If procedural due process violations were to be as broadly defined as Plaintiffs–Appellants would define them, in order to avoid the possibility of committing any constitutional violation, an official charged with discretion would be in the anomalous position of almost being forced to hold a hearing to determine whether or not an emergency

exists, so as to then determine whether a predeprivation hearing is constitutionally required. This cannot be the proper result.

■ Applying these principles to the facts of this case, we find that Plaintiffs have not adduced sufficient evidence from which a reasonable trier of fact could infer that Fusco abused the discretion constitutionally afforded him in invoking the emergency demolition procedure. The event which precipitated the demolition, namely the automobile accident, is in no way attributable to the Defendants. These facts therefore do not implicate the specter of random demolition; the Defendants merely reacted to an incident that was beyond their control, and Plaintiffs can complain only that Defendants' behavior was at most opportunistic. There is, however, insufficient evidence from which a reasonable trier of fact could infer that Defendants opportunistically seized upon the automobile accident as a pretext to destroy the Buildings.

The undisputed fact is that the building was severely damaged by the accident. The accident destroyed at least one column that supported the facade of the building, and the facade had developed a significant crack. Additionally, in the words of Plaintiffs, a 12" by 12" header was compromised by the accident. It is also undisputed that Fusco ordered the demolition immediately, and that it began within two hours of the accident.

In light of these undisputed facts, and despite the evidence submitted by Plaintiffs, which we assume to be true for purposes of this analysis, that the building was in fact structurally sound, no reasonable trier of fact could find that Fusco acted arbitrarily or otherwise abused his discretion, in deciding to invoke the emergency procedure. The undisputed evidence of the damage to the buildings provides ample support for a conclusion that Fusco had a reasonable belief that the public was in immediate danger. Further,

Plaintiffs provide no additional evidence to support a finding that Fusco's decision was arbitrary, or constituted an abuse of discretion, in determining that the buildings, in their damaged condition, constituted a danger to the public safety, and needed to be destroyed.[4] Finally, we note that the Plaintiffs do not contest the adequacy of the postdeprivation remedies which are still available to them. Accordingly, the district court's grant of summary judgment to the Defendants on the procedural due process claim was proper.

## B. *The Substantive Due Process Claim*

■ To succeed on their substantive due process claim, Plaintiffs–Appellants must show that the government action was "arbitrary, conscience-shocking, or oppressive in a constitutional sense," and not merely "'incorrect or ill-advised.'" *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir.1995) (citations omitted).

■ As noted above, Plaintiffs presented absolutely no evidence which suggests that Defendants actions were anything worse than incorrect or ill-advised. There is nothing to suggest that Defendants did anything more than order the demolition of the Buildings, which had been severely damaged by an automobile accident, in order to protect the public safety. Absent some evidence of a culpable state of mind on the part of Defendants, and Fusco (who actually made the demolition decision) in particular, which Plaintiffs do not provide, no reasonable trier of fact could find this demolition to be arbitrary, conscience-shocking or otherwise constitutionally oppressive.

4. As discussed below, Plaintiffs have failed to supply sufficient evidence from which a reasonable trier of fact could infer from Defendants' housing policies that they bore any racial animus. Even if Plaintiffs had shown such, to prevent summary judgment on the procedural due process claim, they would have to show some racial animus on the part of Fusco individually, as he was vested with the sole discretion to order the emergency demolition, and no one exhibiting any racial motivation was shown to have contributed to

## C. *The Equal Protection Claim*

■ To prevail on an equal protection claim, "[p]roof of racially discriminatory intent or purpose is required." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Plaintiffs have presented no evidence to prove such racial animus;[5] their argument merely piles one inference upon the next in seeking to construct some logical framework from which one might be able infer that the Defendants may harbor some racial animus.

There is no evidence suggesting that the Defendants, and Fusco in particular, even knew the racial makeup of the tenancy of the Buildings prior to the demolition. There is, however, substantial and uncontradicted census data in the record indicating that low income whites substantially outnumbered low income African Americans, Hispanics and other minorities in the area in which the Buildings were located. However, even assuming it to be true that minorities disproportionately inhabit buildings such as those destroyed, there is no evidence to suggest that Defendants actually knew this fact themselves, and *therefore* this fact does not make reasonable an inference that Defendants knew the demolition would disproportionately affect minorities.

Even if Plaintiffs did show that a reasonable trier of fact could find that Defendants knew the racial makeup of the tenancy of the Buildings, this fact alone would not be enough under *Arlington Heights*, which requires not merely disparate im-

that decision. Plaintiffs have failed to even make such an allegation.

5. DeStefano's "instant urban renewal" comment is not sufficient. The emergency procedure vests discretion in Fusco, and DeStefano's comment, even if considered evidence of racial animus, was not shown to have influenced Fusco and is not indicative of Fusco's intent.

pact, but proof of racially discriminatory intent. *Id.* The "context" of the demolition, upon which Plaintiffs seek to rely, does not supply this proof. The context consists of conclusory allegations, supported by anecdotal evidence, that the City and its Mayor, DeStefano, maintained housing policies which might have a disproportionately adverse impact on minorities. This does not meet the standard of *Arlington Heights.* First, Fusco, who made the demolition decision, is not in any way tied to the allegedly discriminatory policies. Furthermore, there is no evidence of actual racially discriminatory intent in either the housing policies or in the demolition, and the context evidence does not amount to a "clear pattern, unexplainable on grounds other than race," which would excuse such a showing. *Id.* at 266, 97 S.Ct. 555. This type of conclusory allegation of discriminatory impact in DeStefano's approach to the City's housing programs simply cannot convert the decision to demolish two buildings into an equal protection violation.

### D. *The FHA Claim*

■ Although it is true that the FHA claim does not require proof of discriminatory intent, *see Orange Lake Assocs., Inc. v. Kirkpatrick,* 21 F.3d 1214, 1227 (2d Cir. 1994), Plaintiffs' FHA claim fails for similar reasons. To make out an FHA claim, Plaintiffs must allege an action which has a discriminatory effect, either through an "adverse impact on a particular minority group," or through "harm to the community generally by the perpetuation of segregation." *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 937 (2d Cir.1988).

■ The City's policy for providing low income housing may or may not violate the FHA. However, the Plaintiffs here are not challenging the overall housing policy of the city; they are merely challenging the demolition of Catanzaro's buildings. As noted above, Plaintiffs have failed to provide sufficient evidence from which it can be reasonably inferred that Defendant's housing policies have a discriminatory effect, much less that the demolition of two buildings which had been damaged in an automobile accident constituted a part of such a discriminatory policy. Therefore, Plaintiffs' Fair Housing Act claim fails as well.

For the reasons stated above, the decision of the district court is AFFIRMED.