# United States Court of Appeals
## For the First Circuit

Nos. 13-2244
     13-2248

SOUTH COMMONS CONDOMINIUM ASSOCIATION; DONALD E. HOUGHTON;
JUDITH A. HOUGHTON; PETER A. ZORZI; SOUTH MAIN REALTY, LLC;
  SH REALTY, LLC; JOSEPH M. LAVINSKI; JUDITH D. LAVINSKI;
DALE ELLIOT BASS; LUCY M. PETERSON; MICHELLE J. KACZENSKI;
STUDIO ONE, INC.; BALBONI ASSOCIATES, INC.; MBL HOUSING AND
 DEVELOPMENT, INC.; GREGORY P. ZORZI; EDWARD A. PESSOLANO;
JAVIER MULERO, d/b/a Divalicious Salon; THOMAS M. BOVENZI,
     Trustee of Main-Hubbard Realty; MADELINE R. ZORZI,

Plaintiffs, Appellants/
    Cross-Appellees,

v.

CHARLIE ARMENT TRUCKING, INC.,

Defendant, Appellee/
   Cross-Appellant,

CITY OF SPRINGFIELD, MA; DOMENIC J. SARNO, JR., Mayor of
Springfield; STEVEN DESILETS, Springfield Building Commissioner;
DAVID COTTER, Deputy Director of Code Enforcement, Springfield
Housing Division,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Barron, Circuit Judges.

          John J. McCarthy, with whom Jesse W. Belcher-Timme and
Doherty, Wallace, Pillsbury and Murphy P.C. were on brief, for
appellants/cross-appellees.
          Kara Thorvaldsen, with whom George C. Rockas and Wilson,
Elser, Moskowitz, Edelman and Dicker LLP were on brief, for
appellee/cross-appellant.
          Edward Pikula, with whom Lisa DeSousa, Anthony Wilson, and
the City of Springfield Law Department were on brief, for
appellees.

December 23, 2014

**BARRON, Circuit Judge.** On June 1, 2011, a devastating tornado struck the City of Springfield, Massachusetts. The twister ripped through the downtown area and caused a great deal of damage. Among the buildings affected were the South Commons Condominiums. This appeal concerns the lawsuit the owners of those buildings brought against the City, its officials, and one of its contractors.[1]

The owners chose to name those defendants because the destruction of the buildings did not result -- at least not directly -- from the unprecedentedly high winds that stunned the City that day. The destruction instead resulted from the demolition the City ordered -- and the contractor carried out -- just one day after the tornado hit.

In seeking damages for the loss, the owners say the tornado did not cause enough harm to their buildings to justify the City's drastic response. And the owners further say the City acted precipitously -- and, ultimately unconstitutionally -- in razing the buildings without letting them show how the buildings could

---

[1] In addition to the owners, the plaintiffs in the lawsuit include some of the buildings' residential and commercial tenants, as well as the South Commons Condominium Association. For ease of exposition, we will refer to the group collectively as "the owners" throughout.

The City officials named as defendants were Domenic J. Sarno (the Mayor of Springfield), Steven Desilets (Springfield's Building Commissioner), and David Cotter (Springfield's Housing Division's Deputy Director of Code Enforcement). But again for simplicity's sake, we will refer only to the City.

-3-

have been saved. The City defends the demolition as a proper response to an unprecedented natural disaster. But the City also argues the process it used to make that emergency judgment followed Massachusetts law and satisfied the demands of the federal Constitution -- at least given the allowance the City says the federal Constitution makes for swift (and thus sometimes mistaken) governmental efforts to deal with the immediate dangers damaged properties sometimes pose.

In deciding this appeal, we, like the District Court, consider only the federal constitutional due process issues. We leave the owners' various state law claims to the more appropriate forum: the state courts. And in resolving the federal constitutional issues, we, like the District Court, do not decide whether the City's decision to demolish the buildings was the right one to make. We decide only that, on the record before us, the District Court correctly concluded the demolition did not deprive the owners of their property in violation of the federal Constitution's guarantee of due process of law. Critical to that judgment, moreover, is our conclusion that Massachusetts offers an adequate remedy for whatever wrongful loss the owners may have suffered in consequence of the City's actions. For these reasons, we affirm the District Court's judgment dismissing the owners' federal suit under 42 U.S.C. § 1983 with prejudice and their pendent state law claims without prejudice.

The tornado cut through the center of the City and caused significant damage throughout the downtown. Both the Massachusetts governor and the Springfield mayor declared a state of emergency. City officials quickly determined the South Commons Condominiums -- a complex consisting of buildings located at 959-991 Main Street, 14 Hubbard Avenue, and 133 Union Street -- were among the properties that suffered significant damage. Charlie Arment Trucking, Inc., a private company hired by the City, demolished most of those buildings the next evening, June 2, 2011. Only one of the condominium units, Unit 10, was left standing.

Those basic facts are not in dispute. We recite the rest as the plaintiffs describe them in their complaint, as we do when we review a district court's decision to grant a motion to dismiss. See SEC v. Tambone, 597 F.3d 436, 438 (1st Cir. 2010) (en banc).

The National Guard and the state police restricted access to parts of the City. They evacuated the residents of the South Commons Condominiums. The City ordered residents to leave the buildings. The residents were not allowed to return to the buildings even though they could have been made safe enough to allow for retrieval of their contents. The City provided no notice to the residents of the South Commons Condominiums that the City believed the buildings presented an immediate danger to public safety that would require their demolition. Thus, the residents

were given no opportunity to attempt to stop the demolition. Nor were engineering studies or analyses undertaken to confirm the need to address the danger the buildings posed or to assess whether the buildings might be spared.

Nevertheless, Charlie Arment Trucking, Inc., the private demolition company hired by and acting at the direction of the City, took down the South Commons Condominiums in a matter of hours.[2] Only days later did City officials issue orders, addressed to individual unit-owners, tenants, and to the South Commons Condominium Trust, relating to the demolition.[3]

Afer the passage of nearly a year, the owners of the South Commons Condominiums filed suit in federal district court for damages against the City, several City officials, and Charlie Arment Trucking, Inc. The suit claimed violations of the owners' procedural and substantive due process rights under 42 U.S.C. § 1983, as well as various violations of Massachusetts state law. The District Court dismissed the federal claims with prejudice under Federal Rule of Civil Procedure 12(b)(6) and dismissed the

---

[2] The City later sought to impose a lien on the South Commons Condominiums for the amount of the demolition costs.

[3] The orders began issuing on June 8, 2011, and the City sent them to the recipients' alternate addresses in some instances, and also, in some cases, to their addresses at the South Commons Condominiums. In some cases, moreover, the orders were to vacate the buildings -- something that was not possible given they had been demolished already.

state claims without prejudice as an exercise of its discretion to deal with pendent claims.  This appeal by the owners followed.[4]

## II.

We start with the owners' constitutional concerns about the processes the City used -- or rather, did not use before the demolition.  And, to do so, we evaluate the demolition with reference to the state law that authorized it.  See Zinermon v. Burch, 494 U.S. 113, 126 (1990) ("[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.  This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.").

---

[4] The owners argue the District Court improperly relied on materials outside of the pleadings in ruling on the motion to dismiss.  However,

> [a] motion to dismiss is not automatically transformed into a motion for summary judgment simply because matters outside the pleadings are filed with, and not expressly rejected by, the district court.  If the district court chooses to ignore the supplementary materials and determines the motion under the Rule 12(b)(6) standard, no conversion occurs.

Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18 (1st Cir. 1992).  Reviewing the district court's order, we are satisfied that supplemental materials, though mentioned "to fill in the background," were properly excluded in the actual determination of the motion under a Rule 12(b)(6) standard.

-7-

We undertake that evaluation de novo, which is the same standard we use to evaluate the owners' substantive due process claim. We use this standard as we are reviewing the District Court's decision to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). See Vistamar, Inc. v. Fagundo-Fagundo, 430 F.3d 66, 69 (1st Cir. 2005).

**A.**

The parties agree the City did not provide the usual guarantees of constitutional procedural due process -- notice and an opportunity to be heard -- before depriving the owners of their property. But, in some circumstances, the constitutional right to procedural due process does not actually require the use of those advance safeguards, at least when the state provides an adequate remedy afterwards -- or, as the cases often say, post-deprivation. See, e.g., Harris v. City of Akron, 20 F.3d 1396, 1401 (6th Cir. 1994) ("Such a procedure satisfies the 'fundamental requirement of due process' -- an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting Parratt v. Taylor, 451 U.S. 527, 540 (1981), overruled in part on other grounds by, Daniels v. Williams, 474 U.S. 327 (1986))).

And so, we must answer two questions. First, we must decide whether this case involves the kind of special circumstance that would permit a demolition to proceed without the use of those advance procedural protections. And, second, if this case does

involve such a special circumstance, we must decide whether state law supplies the owners with an adequate after-the-fact remedy for any wrong the City may have committed.

**1.**

"The Court has often acknowledged . . . that summary administrative action may be justified in emergency situations," Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 299-300 (1981), and the reason is not hard to grasp. By their nature, emergency situations require an immediate response. And, in consequence of "the necessity of quick action by the State," Parratt, 451 U.S. at 539, constitutional due process does not require the usual up-front procedural protections in dealing with emergencies. The need for speed, in other words, permits the government to take action that may cause a loss to property without first notifying the owner of the property or waiting to hear what that owner has to say, even though the government might have saved itself from making a costly mistake by taking the time to give notice and to wait for a response. See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 687 F.3d 465, 488 (1st Cir. 2012) (en banc) (requiring "additional predeprivation safeguards would defeat the very purpose of the emergency statute" when "the very point of [these] emergency procedures is to permit public officials to act promptly where there is an emergency"); Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 419-20 (3d Cir. 2008)

-9-

(officials' "far from perfect" response to a health hazard was permissible when "faced with a situation in which a failure to act quickly could have serious health consequences"); Herwins v. City of Revere, 163 F.3d 15, 18 (1st Cir. 1998) ("No one can seriously doubt that emergency conditions may exist (e.g., a severe fire hazard) that would warrant a peremptory shutdown of a residential building.").

As to what circumstance qualifies as an emergency that might justify such speedy action, the Supreme Court has observed that a "deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action." Hodel, 452 U.S. at 300 (alteration in original) (quoting Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599 (1950)). Hodel itself upheld an emergency procedure that allowed the Secretary of the Interior to issue summary cessation orders when a mining operation posed an "imminent danger to the health and safety of the public." Id. at 301. And we have held similarly in circumstances that are analogous, though not identical. In San Gerónimo, for example, we approved of an emergency procedure for freezing construction without first providing notice or an opportunity to challenge the delay. There, Puerto Rico had put in place the summary procedure to protect against the danger to the public that would result if the government did not act quickly. 687 F.3d at 481-82. And in Herwins, we approved of an emergency

-10-

summary procedure for ordering a building's occupants to vacate due to dangers the building was thought to pose to its inhabitants. 163 F.3d at 18-19.

This case fits comfortably within this line of authority. The City asserts the right to carry out the demolition under the grant of summary power contained in chapter 143, section 7 of the Massachusetts General Laws.[5]  And while, to the uninitiated, this statutory scheme is not entirely clear, it plainly does permit the City to carry out a summary demolition of a damaged building when the "public safety . . . requires" such "immediate[]" action to address a "danger[] to life or limb."  Mass. Gen. Laws ch. 143, §§ 6, 7.[6]

_____

[5] The City also relies on two regulations, section 116.3 and section 5121.3, both of which correspond to section 7.  See 780 Mass. Code Regs. §§ 116.3, 5121.3.  The former is from the general building code, and the latter is from the specialized building code applicable to single and two-family dwellings.  (We cite the regulations -- from the eighth edition of the general building code and the seventh edition of the code for single- and two-family dwellings, respectively -- that were operative at the time of the demolition.)

[6] The statutory scheme authorizes the local inspector to inspect buildings upon a report of their dangerousness:  "The local inspector, immediately upon being informed by report or otherwise that a building or other structure or anything attached thereto or connected therewith in that city or town is dangerous to life or limb . . . , shall inspect the same."  Mass. Gen. Laws ch. 143, § 6.  Section 6 of the scheme then goes on to provide that in the ordinary case, the inspector "shall forthwith in writing notify the owner, lessee or mortgagee in possession to remove it or make it safe if it appears to him to be dangerous . . . ."  See also 780 Mass. Code Regs. §§ 116.2, 5121.2.  Section 7 then provides that, ordinarily, "[a]ny person so notified shall be allowed until twelve o'clock noon of the day following the service of the notice in

That triggering standard, moreover, is at least as limiting as the ones at issue in <u>San Gerónimo</u> and <u>Herwins</u>. <u>See</u> <u>San Gerónimo</u>, 687 F.3d at 481 (concluding the standard authorized summary action only in a "situation in which there is imminent danger to the public health, safety and welfare or which requires immediate action by the agency" (quoting P.R. Laws Ann. tit. 3, § 2167(a))); <u>Herwins</u>, 163 F.3d at 18-19 (concluding emergency law authorized "an immediate shutdown of a building where an emergency exists threatening health or safety," and thus ensured "an opportunity to object before a building is shut down <u>except</u> in emergencies"). We are thus not dealing with an emergency statute only in form.

True, this case involves a demolition, which was not at issue in either <u>Herwins</u> or <u>San Gerónimo</u>. But while a demolition may cause a loss more total (if not always more costly) than a delayed start to construction or a temporary order to vacate, the drastic nature of that response does not make the justification for departing from the ordinary means of ensuring due process any less

---

which to begin to remove such structure or make it safe, or to make it secure." In an exceptional case, however, the City may act summarily: "[B]ut if the public safety so requires and if the aldermen or selectmen so order, the inspector of buildings may immediately enter upon the premises . . . and cause such unsafe structure to be made safe or taken down without delay . . . ." Mass. Gen. Laws ch. 143, § 7. <u>See, e.g.</u>, <u>Daggett</u> v. <u>Bd. of Assessors of Town of Saugus</u>, 914 N.E.2d 362, 362 n.5 (Mass. App. Ct. 2009) (unpublished) (finding that section 7 allowed "the local inspector to act expeditiously in appropriate circumstances").

-12-

persuasive. If a building is so badly damaged it must be demolished immediately to protect life and limb, then it surely poses a serious danger to the public safety that must be addressed with dispatch. See Catanzaro v. Weiden, 188 F.3d 56, 62-63 (2d Cir. 1999) (finding summary demolition of property permissible to eliminate an "immediate danger" to public safety).

For these reasons, the state law before us is nothing like the state law the Supreme Court found constitutionally deficient in Zinermon v. Burch, 494 U.S. 113 (1990). Cf. Harris, 20 F.3d at 1404 (holding that the "only available course of action" in an emergency, not presented in Zinermon, is to take summary action). In Zinermon, Florida state law set forth procedures for both voluntary admission and involuntary commitment to state mental hospitals. The processes for the former were spare while those for the latter included the traditional rights to notice and a hearing. The state law then delegated to hospital employees the authority to determine when to invoke the more protective involuntary commitment safeguards. The state law therefore conferred upon those hospital employees the discretion not to invoke those safeguards, with the result that patients who presented themselves for admission but who were unable to give informed consent could in effect be involuntarily committed without formal process. Zinermon, 494 U.S. at 122-23.

Zinermon concluded it was practical to impose more procedural safeguards at the point of admission than the state had put in place. And the Court also concluded it was predictable that an admission of someone unable to provide informed consent would ensue without the use of greater safeguards at the time of admission, given the difficulty those seeking voluntary admission might have in making an informed judgment. Id. at 138-39 ("Such a deprivation is foreseeable, due to the nature of mental illness, and will occur, if at all, at a predictable point in the admission process."). As a result, the Court held the hospital employees could be sued for violating procedural due process. The theory was that the hospital employees could be liable for "abus[ing] . . . broadly delegated, uncircumscribed power" in choosing not to use the involuntary commitment process, with the notice and hearing rights that would have attended that more formalized method of commitment. Id. at 136.

But section 7 does not confer "broadly delegated, uncircumscribed power" to proceed in summary fashion. See San Gerónimo, 687 F.3d at 486 (quoting Zinermon, 494 U.S. at 135–36). The statute instead marks off "an exception to be used only in emergency situations." Id. at 485. The City may carry out a summary demolition only upon a determination a damaged property is so dangerous to life and limb that immediate demolition is required to protect "the public safety." Mass. Gen. Laws ch. 143, §§ 6, 7.

-14-

Section 7 thus renders impractical the provision of advance notice and an opportunity to be heard. Such up-front processes would impede the City from doing what needs to be done to protect the public from the immediate danger the summary demolition procedure is designed to address.

Nor, we note, is the application of this triggering standard left solely to the local inspector who -- under the statute -- first learns of the danger a building presents. Rather, under section 7 and its attendant regulations, a summary demolition may occur only if an actor directly accountable to the voters concludes the standard for summary action has been met.[7] For that reason, too, the law considered in Zinermon is far removed from the one we consider here.

Of course, under Massachusetts law, an official may conclude in a particular case that there is an immediate need to

---

[7] By the express terms of the statute, it appears that -- in the case of a city -- the "aldermen" must provide the authorization. Mass. Gen. Laws ch. 143, § 7. But the regulations issued pursuant to section 7 provide that the building commissioner can act immediately -- again, in the case of a city -- if ordered by the mayor. Both regulations provide that: "[I]f the public safety so requires and if the mayor or selectmen so order, the building official may immediately enter upon the premises with the necessary workmen and assistants and cause such unsafe structure to be made safe or demolished without delay . . . ." 780 Mass. Code Regs. §§ 116.3, 5121.3 (emphasis added). Neither party raises any issue about whether this shift from the alderman to the mayor in the regulations is one that section 7 permits, and so we assume for the purposes of this case that the regulations are valid notwithstanding the way they depart from the plain text of the underlying statute.

address a danger -- and thus proceed in the summary fashion section 7 allows -- when, in hindsight, there was no need to rush. But an emergency standard must be written to be of practical use. An official applying that standard must make an on-the-spot judgment about how best to protect the public from the immediate danger a badly damaged building poses. Such a practicably workable standard is sure to be imprecise enough to require the official to make judgment calls about the urgency of the need to act. That some such calls may be mistaken does not show that the process for making them was constitutionally improper.

For that reason, it does not matter if the owners are right that the City violated section 7 because the "public safety" did not in fact require the "immediate" demolition that occurred. The Supreme Court has made clear that government officials do not commit a federal procedural due process violation simply by erroneously applying a state law that, if followed, would survive a procedural due process challenge. That is because "[t]he state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." Hudson v. Palmer, 468 U.S. 517, 533 (1984); see also Herwins, 163 F.3d at 19 (discussing relevant considerations). So long as a state has not set up a scheme so open-ended it invites unwarranted uses of summary process, see Zinermon, 494 U.S. at 138, and so long as a state

provides an adequate after-the-fact remedy for any wrongful summary action, see Parratt, 451 U.S. at 543-44, allegations of the kind of "random and unauthorized" mistakes in application that those who work in government sometimes make are not enough to state a procedural due process claim, Hudson, 468 U.S. at 533. And thus, the alleged state law error -- if error it was -- cannot save the owners' procedural due process claim, at least so long as an adequate, post-hoc remedy is available.

## 2.

We thus now turn to a consideration of whether Massachusetts makes available an adequate after-the-fact remedy for any wrongs the City may have committed in carrying out the summary demolition. In both San Gerónimo and Herwins, we found the state did provide such a remedy. San Gerónimo, 687 F.3d at 490; Herwins, 163 F.3d at 19-20. And we find the same to be the case here.

The City identifies chapter 139, section 2 of the Massachusetts General Laws as the state law that supplies the post-hoc remedy the federal Constitution requires. That statute allows a property owner to challenge an order for demolition and to seek to annul, alter, or affirm the order.[8] Section 2 also authorizes

---

[8] Section 2 provides that:

A person aggrieved by such order may appeal to the superior court for the county where such building or other structure is situated, if, within three days after the service of such attested copy upon him, he commences a civil action in such court. Trial by jury shall be had

-17-

a property owner to seek damages for an already-demolished building, at least in circumstances in which the suit under section 2 began prior to the demolition. City of Worcester v. Eisenbeiser, 387 N.E.2d 1154, 1156-57 (Mass. App. Ct. 1979). And although the orders in this case were sent only after the buildings had been torn down, the City argues that a demolition order that post-dates a demolition is equally subject to challenge and annulment under section 2.

The text of section 2 does not say otherwise, and we are not aware of anything else in Massachusetts law that would suggest the remedy provided by section 2 is not available for a suit brought post-demolition. Nor the do the owners point to anything in making conclusory assertions to the contrary. Their complaint merely asserts in sweeping fashion that no adequate state law remedies exist. They do parenthetically reference the text of section 2 in their opening brief, and the text of chapter 143, section 10 of the Massachusetts General Laws, which cross-references section 2, in their reply.[9] But they cite no case --

---

as in other civil causes. The jury may affirm, annul or alter such order . . . . [I]f it is annulled, he shall recover from the town his damages, if any, and costs . . . .

Mass. Gen. Laws ch. 139, § 2.

[9] Section 10 provides that:

An owner, lessee or mortgagee in possession aggrieved by such order may have the remedy prescribed by section two

-18-

federal or state -- interpreting either provision, let alone any case supporting their preferred reading of them.  Nor do they address the cases cited by the City suggesting just the opposite reading is the better one, see, e.g., City of Worcester, 387 N.E.2d at 1156-57 (annulling order after demolition), or cope with the possibility that the text of section 10 is against them.  In fact, because section 10 makes clear the remedy of section 2 cannot delay swift action, section 10 appears to indicate the remedy of section 2 can be deployed post-demolition, as at that point the risk of such delay is none.  See, e.g., Aubuchon v. Com. of Mass. by & through State Bldg. Code Appeals Bd., 933 F. Supp. 90, 93 (D. Mass. 1996) (finding that the Massachusetts remedial framework in sections 2 and 10 was an adequate post-demolition remedy, and suggesting its availability in that plaintiffs had "filed a separate (and ongoing) civil action in the Superior Court pursuant to the remedial statute").

The owners do also suggest there may be a cap on the damages available under section 2 -- and, presumably, that this cap makes the remedy a constitutionally inadequate substitute for advance notice and an opportunity to be heard.  But no such cap

_____

of chapter one hundred and thirty-nine; provided, that no provision of said section two shall be construed so as to hinder, delay or prevent the local inspector acting and proceeding under section nine . . . .

Mass. Gen. Laws ch. 143, § 10.

-19-

actually appears on the face of the statute.  Nor does the City

contend otherwise, having conceded the absence of any such cap at

oral argument.   The owners argue such a cap exists only by

referencing the text of a different remedy, the state's Tort Claims

Act, which has a liability cap of $100,000.  See Mass. Gen. Laws

ch. 258, § 2.  They provide no explanation for why that cap would

be broadly applicable to other remedial statutory provisions, nor

can we find any authority so suggesting.[10]

      We thus believe section 2 does constitute an adequate

remedy.  The owners, having chosen a federal forum to seek relief

that depends at least in part on the meaning of state law, should

not "expect the federal court to steer state law into unprecedented

configurations," Santiago v. Sherwin Williams Co., 3 F.3d 546, 549

(1st Cir. 1993) (internal quotation marks omitted), but that is

what would be required for us to find section 2 inadequate.  And

so, lacking any authority that would require us to hold

Massachusetts intends to preclude this uncapped post-demolition

---

[10] In their initial filings in the District Court, the owners claimed damages of $23 million.  The owners claim the liability cap in the state's Tort Claims Act makes the statute incapable of fully compensating for their losses and thus inadequate to count as a constitutional substitute for the pre-deprivation process they were denied.  See Mass. Gen. Laws ch. 258, § 2.  But in light of the uncapped remedy in section 2 of chapter 139, see Mass. Gen. Laws ch. 139, § 2, we need not consider whether the state's Tort Claims Act, given its cap, would provide an adequate post-deprivation remedy.  But see Hudson v. Palmer, 468 U.S. 517, 535 (1984) ("that Palmer might not be able to recover under these remedies the full amount which he might receive in a § 1983 action is not, as we have said, determinative of the adequacy of the state remedies").

remedy, we decline to accept the owners' bare assertion that we should reach that conclusion.

That said, we are aware the section 2 remedy may be foreclosed to these particular plaintiffs because of their failure to challenge the demolition in state court in a timely manner. And we are aware as well that the limitations period applicable to actions brought under section 2 is, at least on its face, very short. See Mass. Gen. Laws ch. 139, § 2 ("A person aggrieved by such order may appeal . . . within three days after the service of such attested copy upon him . . . ."). But this case is much like Herwins, where we said of a seven-day time-limit to bring a challenge to the summary vacate order there at issue, "[q]uite possibly, there are circumstances -- perhaps present here, although we doubt it -- where it is simply infeasible for an appeal to be noticed within seven days. If the state then refused to permit a belated appeal thereafter, this might raise a question whether state remedies were adequate, but Herwins made no such effort to appeal even belatedly." 163 F.3d at 20 (internal citation omitted).

So, too here. The owners did not object in district court to the characterization by the City's attorney that "[t]here's been no effort to exercise any rights under 139 [section 2] or 258 [the state Tort Claims Act] or any other remedies that might be out there," and in fact the owners did not file even this

action until nearly a year after the last order relating to the demolition issued. Nor, finally, do the owners actually challenge in this appeal the constitutionality of the short time limit section 2 provides for filing for relief. And so, if it is now too late for the owners to bring a challenge under section 2, that is a function in this case of when the owners sought to avail themselves of the remedy, rather than its necessary constitutional inadequacy.

For these reasons, we cannot conclude Massachusetts fails to provide an adequate post-deprivation remedy to the owners. And that means we cannot conclude the City denied the owners procedural due process.

**B.**

The owners' substantive due process claim also must be dismissed. A substantive due process claim must allege executive action that objectively "shocks the conscience." See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). "[T]he requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." Amsden v. Moran, 904 F.2d 748, 754 n.5 (1st Cir. 1990). Under this high standard, even a state actor's bad faith is not necessarily enough to satisfy the "shock the conscience" test. See id. at 757 ("[e]ven bad-faith violations of state law are not necessarily tantamount to unconstitutional deprivations of due process"). And here, we do not have an

allegation of even that kind regarding the City's decision to order the demolition.

To the contrary, the owners concede the City undertook the demolition in response to what it claimed was an immediate danger to the public safety. And the owners further concede the tornado did cause "significant damage" to the South Commons Condominiums. The owners' complaint thus appears to allege only that in ordering the demolition the City misjudged the gravity of the damage the tornado caused and thus that the City's action was "incorrect or ill-advised." Catanzaro, 188 F.3d at 64. The allegations in the owners' complaint do not show that the City acted in any way that could be deemed conscience-shocking, see Lewis, 523 U.S. at 846, see also DePoutot v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005) ("Executive branch action that sinks to the depths of shocking the contemporary conscience is much more likely to find its roots in 'conduct intended to injure in some way unjustifiable by any government interest.'" (quoting Lewis, 523 U.S. at 849)), and thus the owners' substantive due process challenge must fail.

## C.

That leaves only the state law claims.[11] But having dismissed the federal claims at such an early stage, the District Court properly exercised its discretion in dismissing the state law claims without prejudice. 28 U.S.C. § 1367(c); see also Martinez v. Colon, 54 F.3d 980, 990-91 (1st Cir. 1995). We therefore decline the cross-appellant Charlie Arment Trucking, Inc.'s invitation to revisit the state claims.

## III.

We recognize it is no small thing to have a tornado unexpectedly damage one's buildings and then have them razed because the city ordered them destroyed. But we deal here only with the question whether the federal Constitution's guarantee of due process barred the City from making that decision. And precedents from the Supreme Court and this Circuit, as well as from other circuits, reflect the reality that a city responding to a natural disaster must make difficult choices with dispatch in order to protect the public. Thus when a city decides buildings are sufficiently damaged that they must immediately be demolished to

---

[11] In addition to the procedural and substantive due process claims, the complaint asserts claims for violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I, against all defendants (count three); negligence against Charlie Arment Trucking, Inc. (count four); trespass against Charlie Arment Trucking, Inc. (count five); conversion against Charlie Arment Trucking, Inc. (count six); and seven of the plaintiffs assert a chapter 93A claim against Charlie Arment Trucking, Inc. (count seven).

protect life and limb, and when the city does so pursuant to a state law that anticipates such an emergency and authorizes the use of summary procedure to respond to it, the remedy for any wrong, absent conscience shocking behavior, must come from the remedies the state itself supplies rather than from a federal suit premised on the federal Constitution's Due Process Clause. The District Court's judgment is, accordingly, AFFIRMED.